64864. REGIONAL PACESETTERS, INC. v. HALPERN
ENTERPRISES, INC. et al.
64865. HALPERN ENTERPRISES, INC. v. REGIONAL
PACESETTERS, INC.

McMURRAY, Presiding Judge.

Plaintiff Regional Pacesetters, Inc. is the assignee of a sublease between Eckerd's Cheshire Bridge Road, Inc., the lessee, and Dance City of Georgia, Inc., the sublessee. Defendant Halpern Enterprises, Inc. (Halpern) is the landlord of the subject premises. Plaintiff brought suit against Halpern and against both Eckerd Drugs of Georgia, Inc. and the Jack Eckerd Corporation (one of which allegedly being the responsible lessee rather than Eckerd's Cheshire Bridge Road, Inc.), seeking specific performance of an attempted exercise of a renewal option and, alternatively, damages and punitive damages. Plaintiff moved for partial summary judgment, seeking a judgment that the lease was validly renewed. Defendant Halpern moved for full summary judgment, seeking a judgment that the lease was not validly renewed. The trial court denied plaintiff's motion and granted Halpern's, reserving however the issue of whether defendant Halpern was indebted to plaintiff in unjust enrichment for improvements made by plaintiff for determination by jury. The cases

here joined are plaintiff's appeal of the denial of its motion for partial summary judgment and the granting of Halpern's motion for summary judgment (case number 64864) and Halpern's cross-appeal of the reservation of the unjust enrichment issue for the jury (case number 64865).

The rights and obligations of the parties sub judice are governed by the provisions of a written lease executed on or about October 6, 1964, between Dogwood Shopping Center, Inc., as landlord/lessor, and Galaxy Drugs, Inc., as tenant/lessee. The subject of the lease was certain store space in the Dogwood Shopping Center. The lease term was 15 years, initially set to run from March 1, 1965, to the last day of February 1980, but later changed by the parties to run from December 1, 1965, to November 30, 1980. The lease was managed by Adair Realty Company (which later merged with Ackerman & Co., becoming Ackerman/Adair).

The material provisions of the lease relevant to the renewal issue are as follows: Paragraph 8 allows the lessee to sublease the premises without consent of the landlord, but only if the sublessee's operation is part of the lessee's general operation and under the lessee's supervision and control. The paragraph further provides that, except as provided in the preceding sentence, the lessee shall not assign the lease or sublet the premises otherwise without the prior written consent of the landlord endorsed on the lease. Paragraph 16 grants the lessee the exclusive right and option to renew or extend the lease for three additional and successive terms at five years each at the same rent by giving notice in writing to the landlord at least 30 days prior to the expiration of the original lease or any extended term of the lease. Paragraph 27 provides that time is of the essence and further provides that no delay or failure of either party to exercise any right under the lease or to insist upon strict compliance with any of the terms and provisions of the lease shall constitute a waiver of any right under the lease or a waiver of the right thereafter to insist upon strict compliance with the terms and provisions of the lease.

On or about July 21, 1966, Dogwood Shopping Center, Inc. transferred all of its interest as lessor to Edwin F. Edwards, Jr. Sometime prior to September 27, 1970, Galaxy Drugs, Inc. assigned its interest to Colonial Stores Incorporated. On September 27, 1970, Colonial Stores Incorporated assigned its interest to Eckerd's Cheshire Bridge Road, Inc. On September 12, 1973, Eckerd's Cheshire Bridge Road, Inc. subleased the premises to Dance City of Georgia, Inc. Edwin F. Edwards, Jr., the current landlord, consented to the sublease. Adams-Cates Company were the realtors managing the sublease.

Sometime prior to February 20, 1974, Halpern purchased the

Dogwood Shopping Center and all the tenants' leases, including the lease held by Eckerd's Cheshire Bridge Road, Inc. with the sublease to Dance City of Georgia, Inc. On May 22, 1974, Dance City assigned its interest under the sublease to plaintiff Regional Pacesetters, Inc., which then franchised and operated the Fred Astaire Dance Studio at the Dogwood premises. There is no evidence in the record that the landlord, Halpern, consented to this assignment, which was required by paragraph 8 of the prime lease. On May 24, 1974, and again on July 15, 1974, Eckerd's Cheshire Bridge Road, Inc. and plaintiff purported to modify the sublease. Halpern was not party to the modification agreements and there is no evidence that it consented to either modification.

On July 11, 1980, plaintiff's attorney wrote a letter to the Adams-Cates Company. The letter made reference to a May 16, 1980 letter from plaintiff to Adams-Cates in which plaintiff stated its intention to exercise the renewal option and also to a June 18, 1980 letter in which Adams-Cates advised plaintiff that Eckerd's refused to honor the exercise of the option. (Neither letter referred to is part of the record.) Plaintiff's expressed purpose for writing the July 11 letter was to assert its position that it had the right, under the July 15, 1974 sublease modification agreement, to exercise the option with or without the cooperation of Eckerd's and, furthermore, that Adams-Cates "may" inform both Halpern and Eckerd's that it had exercised the option. Plaintiff also sent copies of the letter to Halpern and Eckerd's as well. Halpern received the letter, but apparently ignored it. The only contact between Halpern and plaintiff in the next several months reflected by the record is a letter from Halpern to plaintiff on August 26, 1980, regarding allegedly past due water bills.

Eckerd's apparently also ignored plaintiff's letter. On October 28, 1980, Eckerd's itself attempted to exercise the option. The Jack Eckerd Drug Company, on that date, wrote a letter to Halpern, care of Adair Realty, stating that it elected to exercise the renewal option. The letter, however, was mailed to Adair Realty's (which had become Ackerman/Adair on April 1, 1980) former address and consequently it was not received until November 12, fifteen days after being mailed. Halpern responded on December 12, 1980, by letter to Eckerd's Cheshire Bridge Road, Inc., care of the Jack Eckerd Drug Company, advising that it considered Eckerd's to be a holdover tenant because the attempted exercise of the renewal option was not in compliance with the provisions of the prime lease. The letter also stated that Halpern had just learned of the May 24, 1974 modification to the sublease and that it had never consented to it.

Halpern did not demand that Eckerd's surrender the premises until June 15, 1981 (after plaintiff's suit was filed on June 3, 1981),

when it notified Eckerd's to vacate the premises by August 28, 1981. Prior to this, in April and May 1981, Halpern had expressed to plaintiff and the Eckerd entities that the only tenant it recognized was Eckerd's Cheshire Bridge Road, Inc.

The two issues presented are whether the lease was validly renewed by plaintiff and whether Halpern was unjustly enriched. *Held:*

1. The first issue, more precisely, is whether the renewal option (or extension option, see *Pitman v. Griffeth,* 131 Ga. App. 489, 492-494 (206 SE2d 115)) was effectively exercised by plaintiff's July 11, 1980 letter. Because it was stated unambiguously in the letter that the option was then being exercised and because the letter was received by Halpern well in advance of the time deadline, the issue may be narrowed to whether plaintiff had the right to exercise the option.

Paragraph 16 of the prime lease states: "Landlord hereby grants to Galaxy the exclusive right and option to renew or extend this Lease. . . ." Thus, in order for plaintiff to have the right to exercise the option it must stand in the place of Galaxy. To recoup the chain of tenants, Galaxy Drugs, Inc. assigned its interest to Colonial Stores Incorporated, which, in turn, assigned its interest to Eckerd's Cheshire Bridge Road, Inc. Eckerd's then subleased the premises to Dance City of Georgia, Inc. and plaintiff became the assignee of the sublease.

Plaintiff's principal argument is that it was granted all of the rights of the lessee under the prime lease by virtue of the July 15, 1974 sublease modification agreement between itself and Eckerd's Cheshire Bridge Road, Inc., the lessee. The argument is necessary because the sublease assigned to plaintiff contains no provision for renewal or extension of the prime lease or even of the sublease. We find, however, that the agreement is ineffective (as to Halpern) because, under the express provisions of the prime lease, the lessee could not enlarge the sublease without the prior written consent of the landlord (Halpern), which was not obtained. See *Smith v. Huckabee Properties,* 111 Ga. App. 451, 454 (1) (142 SE2d 320).

Plaintiff argues nevertheless that the agreement created an agency relationship between itself and Eckerd's whereby it had the right to exercise the option as Eckerd's agent. This argument is without merit. Not even a tortured reading of the agreement supports the assertion that it creates an agency relationship. See Code § 4-101 (now OCGA § 10-6-1, effective November 1, 1982). The agreement by its terms purported to grant plaintiff the same rights as held by Eckerd's, not to authorize plaintiff to assert those rights in behalf of Eckerd's. Moreover, even if plaintiff could have acted as the agent for

Eckerd's, the July 11, 1980 letter manifestly shows that plaintiff was acting in its own behalf rather than as an agent and also that it was doing so knowingly contrary to the expressed opposition by Eckerd's. See generally *Ga. Bank &c. Co. v. Hadarits,* 221 Ga. 125, 127 (143 SE2d 627); *Arthur v. Ga. Cotton Co.,* 22 Ga. App. 431 (2) (96 SE 232). For these reasons also, plaintiff's additional argument that Eckerd's ratified plaintiff's act is without merit. Ratification cannot be implied where the act assertedly ratified was not done in behalf of and for the benefit of the party assertedly ratifying it. *Lemmons v. City of Decatur,* 215 Ga. 647, 648 (112 SE2d 597).

A more fundamental reason exists for rejecting plaintiff's assertion of right to exercise the option in that plaintiff was never in privity of contract with Halpern. Plaintiff's asserted privity is by virtue of its being the assignee of the approved sublease. By consenting to the sublease, the landlord (Edwards, followed by Halpern) made the subtenant (Dance City) its tenant. *Hudson v. Stewart,* 110 Ga. 37, 39 (35 SE 178); *McBurney v. McIntyre,* 38 Ga. 261 (1); *Cuesta v. Goldsmith,* 1 Ga. App. 48, 50 (1) (57 SE 983). See also *Vlahos v. DeLong,* 132 Ga. App. 722, 725 (3) (209 SE2d 12); *Ihlanfeldt v. Courtney,* 132 Ga. App. 155 (2) (207 SE2d 653). However, Halpern never consented to the assignment of the sublease. The prime lease prohibited assignments without the prior written consent of the landlord and failure to obtain such required prior written consent renders the assignment not binding on the landlord and the occupant a mere intruder. See *Bass v. West,* 110 Ga. 698 (5) (36 SE 244), and cases cited immediately above. See also *Dutch Inns of America v. United Virginia Leasing Corp.,* 134 Ga. App. 525, 526 (215 SE2d 290); *Morton Realty Co. v. Magnolia Warehouses,* 105 Ga. App. 536, 538 (1) (125 SE2d 102). The purported assignment therefore created no enforceable rights in plaintiff as to Halpern and plaintiff's attempt to exercise those rights was without force. Plaintiff contends that Halpern is estopped by its conduct to assert that the lease was not validly renewed. Plaintiff was not in privity of contract with Halpern, and Halpern therefore had no contractual duty to honor the attempted lease renewal or even respond to it. Thus we find no estoppel. See in this regard *Peter E. Blum & Co. v. First Bank Bldg. Corp.,* 156 Ga. App. 680, 683 (2) (275 SE2d 751). See also Division 2, infra. Compare *Storey v. Austin,* 221 Ga. 692, 695 (1) (146 SE2d 728).

Lastly, plaintiff argues that Halpern is not entitled to rely upon alleged defaults on the part of plaintiff or Eckerd's because Halpern failed to comply with the procedure for default outlined in the prime lease. The paragraph in the lease referred to provides that the landlord is to notify the tenant of alleged default or breach of the

lease within 30 days after the alleged occurrence. We find that plaintiff's argument is unsound, principally in that plaintiff was not the tenant, as we concluded supra, and thus not entitled to such notice under the lease. The argument also fails because the lease clearly contemplates the renewal provision to be independent of the default provision. The renewal provision placed the burden upon the tenant to comply with the terms, with the effect of noncompliance being the lapsing of the option. There is no requirement in the renewal provision that the landlord notify the tenant of non-compliance with the option terms. (Although, under other circumstances, failure to provide reasonable notice could lead to liability; see Division 2, infra.)

In the final analysis, plaintiff was powerless to assert the right to exercise the renewal option because it never acquired the right. We hold that the trial court correctly concluded that, as a matter of law, the lease was not validly renewed and, therefore, the granting of summary judgment in Halpern's favor was appropriate.

2. The second issue presented is whether the trial court erred in reserving the unjust enrichment claim for determination by the jury. The basis for the unjust enrichment claim is plaintiff's assertion that it expended a considerable sum on improvements to the premises, believing it had a five-year extension on its lease. Plaintiff asserts that it spent more than $45,000 in installing an air conditioning unit and in making other improvements to the premises between December 1, 1980, and May 5, 1981. The latter date is significant in that it is the date plaintiff alleges, by affidavit filed with its brief in support of its motion for partial summary judgment, to have first received notice that its attempt to exercise the option was not honored by Halpern. There is no indication in the record that plaintiff knew of Halpern's letter of December 12, 1980, to Eckerd's Cheshire Bridge Road, Inc., advising that the October 28, 1980 attempt by Eckerd's to exercise the option was not in compliance with the option terms.

The theory of unjust enrichment applies when as a matter of fact there is no legal contract (such as we concluded in Division 1), but where the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for. See Matarese v. Moore-McCormack Lines, 158 F2d 631, 634 (2nd Cir. 1946) and cases cited therein. See also *Woodard v. First Nat. Bank,* 159 Ga. App. 769, 771-772 (285 SE2d 229); *Trust Co. of Ga. v. S & W Cafeteria,* 97 Ga. App. 268, 283-284 (103 SE2d 63). See generally 66 AmJur2d 945-946, Restitution and Implied Contracts, § 3. We find that it is applicable in the case sub judice. Although Halpern was not party in contract

with plaintiff and thus was not legally obligated to respect plaintiff's attempt to exercise the renewal option (see Division 1, supra), the issue whether Halpern, by its conduct (as summarized in the facts preceding Division 1), induced plaintiff to expend sums of money which unjustly inured to Halpern's benefit is indeed a question of material fact. Therefore, the trial court correctly reserved the issue for determination by jury. See Code Ann. § 81A-156 (c) (Ga. L. 1966, pp. 609, 660; 1967, pp. 226, 238; 1975, pp. 757, 759) (now OCGA § 9-11-56, effective November 1, 1982).

*Judgment affirmed. Banke and Birdsong, JJ., concur.*

DECIDED JANUARY 14, 1983 —
REHEARING DENIED MARCH 15, 1983 — 

*Taylor W. Jones, Timothy W. Brennan,* for Regional Pacesetters.

*Patricia B. Cunningham, Max Olim,* for Halpern Enterprises, Inc. et al.